# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| WANDA SUE NIMOCKS,<br><br>                    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                    Defendant. | CASE NO. 3:22-cv-00872<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**<u>MEMORANDUM OPINION AND ORDER</u>** |

Plaintiff Wanda Sue Nimocks ("Plaintiff" or "Ms. Nimocks") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the case is before the undersigned pursuant to the consent of the parties. For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.      Procedural History

Ms. Nimocks filed her DIB application on January 30, 2020 and her SSI application on January 31, 2020.[1] (Tr. 15, 65-66, 175-78, 179-85.) She asserted a disability onset date of May 30, 2019. (Tr. 15, 65-66, 210.) She alleged disability due to a back condition, headaches, and

---

[1] Ms. Nimocks was found not disabled in response to prior applications, in a July 23, 2008 decision (Tr. 16, 56-64) and decisions dated September 9, 2013 (Tr. 67, 73, 81, 87, 206-07).

left leg numbness.  (Tr. 99, 111, 210.)  Her applications were denied at the initial level (Tr. 15, 95-104) and upon reconsideration (Tr. 15, 107-14).  Ms. Nimocks requested a hearing.  (Tr. 115-16.)  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on April 8, 2021.  (Tr. 35-54.)

The ALJ issued an unfavorable decision on April 16, 2021, finding Ms. Nimocks had not been under a disability from May 30, 2019 through the date of the decision.  (Tr. 12-33.)  The Appeals Council denied Ms. Nimocks's request for review on March 25, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Ms. Nimocks then filed the pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 9, 10, 12).

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Nimocks was born in 1973.  (Tr. 28, 38.)  She has a high school education (*id.*) and worked as a store clerk, sales clerk, and inspector / hand packager (Tr. 27, 39-40).  She lived with her parents and adult son.  (Tr. 38.)

### B.  Medical Evidence

#### 1.  Treatment History

Following multiple back surgeries and a diagnosis of intractable low back pain with left leg pain, Ms. Nimocks had a spinal cord stimulator implanted on July 2, 2018.  (Tr. 289, 317, 352.)  She presented to Michael Eppig, M.D. on May 15, 2019 as a new patient with complaints of mid to low back pain into both legs and toes, greater on the left than the right.  (Tr. 275.)  She reported a history of seven back surgeries.  (*Id.*)  She was using over-the-counter Tylenol and reported having an implanted spine stimulator.  (*Id.*)  She was training at work to do quality control for a food processer.  (*Id.*)  She reported that she was full weight-bearing and ambulated

2

without aids. (*Id.*) Examination of the lumbar spine showed apparent weakness with balance, antalgic left toe walking, antalgic gait with left leg limp, negative straight leg raise, brisk knee jerk, absent ankle jerk, no clonus, normal muscle strength, and lumbar range of motion to the proximal tibia with toe-touching. (*Id.*) She was diagnosed with status post lumbar spinal fusion and left lumbar radiculopathy. (*Id.*) Dr. Eppig recommended: avoidance of heavy lifting and twisting movement; regular exercise; use of spinal stimulator if it provided relief; pain management; and over-the-counter Tylenol or NSAIDs. (*Id.*)

On June 2, 2019, Ms. Nimocks presented to the emergency room at Mercy Hospital complaining of increased lower and upper back pain which she rated 10/10. (Tr. 372.) She reported having a lot of pain in her upper back since the spinal stimulator was implanted. (*Id.*) She reported taking Tylenol earlier and said she had the stimulator turned off. (*Id.*) She denied radiation or increased numbness or tingling in her lower extremities. (*Id.*) Her pain was related to range of motion and exacerbated by movement. (*Id.*) She reported she was working in a factory where she was on her feet working long shifts. (*Id.*) She was scheduled for an MRI and follow up with her neurosurgeon. (*Id.*) Her physical examination noted diffuse tenderness in the upper back between the bilateral shoulder blades, extending down to the T10 area. (Tr. 374.) She was diagnosed with exacerbation of chronic pain and treated with a single dose of Toradol and Percocet until she could follow up with the neurosurgeon; she was also provided a work note for that day and the next day. (*Id.*)

Although she did not have surgery scheduled yet, Ms. Nimocks presented to Mark Akers, M.D., at Mercy Health on June 4, 2019, for a pre-operative evaluation related to removal of her spinal cord stimulator. (Tr. 375-76.) Her musculoskeletal range of motion was normal and she had no edema. (Tr. 376.) She was cleared for that elective procedure. (*Id.*)

Ms. Nimocks presented to Noel Zimmerman, APRN-CNP of Mark Akers MD Inc. the next day, June 5, 2019, regarding her back and leg pain.  (Tr. 369.)  She reported acute on chronic back pain that started two to four weeks earlier.  (*Id*.)  The pain was in her thoracic spine; she described it as a burning, shooting, and stabbing pain, and rated the severity at 10/10.  (*Id*.)  She reported that the pain radiated to the left thigh, knee, and foot, with associated symptoms of left leg pain, numbness, tingling, and weakness.  (Tr. 369-70.)  She reported her symptoms were aggravated by bending, standing, and sitting.  (Tr. 369.)  Musculoskeletal and neck examinations showed normal range of motion.  (Tr. 370.)  Examination of the thoracic back showed tenderness, pain, and spasm, but normal range of motion, no swelling, no edema, no deformity, no laceration, and normal pulses.  (*Id*.)  She was diagnosed with acute midline thoracic back pain.  (Tr. 371.)  CNP Zimmerman prescribed a course of Prednisone and recommended Ms. Nimocks perform range of motion exercises and gentle stretching as tolerated, use ice and heat, and follow up for further evaluation with her neurosurgeon.  (*Id*.)

Ms. Nimocks returned to Dr. Eppig on June 19, 2019 to review CT results for the lumbar and thoracic spines.  (Tr. 273.)  She primarily complained of mid-thoracic pain that she described as feeling like she was being continuously punched in that area.  (*Id*.)  She reported that she was "used to the lower back pain near her fusion."  (*Id*.)  She was not using her stimulator because it made her feel like she was "on fire" and made her uncomfortable.  (*Id*.)  Diagnostic imaging showed small anterior osteophytes from T3-7 with normal height and alignment and slight retrolistheses at L1-2 with severe foraminal stenosis, left worse than right.  (*Id*.)  Examination findings were similar to those observed during the May appointment.  (*Compare id*. *with* Tr. 275.)  She was diagnosed with status post lumbar spinal fusions and spinal stenosis in the lumbar region without neurogenic claudication.  (Tr. 273-74.)  Dr. Eppig noted that the CT showed the

prior L2 sacrum fusion was solid and secure and the alignment and facets were unremarkable through the thoracic spine.  (Tr. 274.)  He indicated Ms. Nimocks's "primary pain complaint [was] not in correlation to the lumbar spine or the adjacent level" and "suggested she return to the physician who placed her stimulator to discuss removal since it [was] no longer beneficial to her."  (*Id*.)  He encouraged starting an exercise program after removal of the stimulator.  (*Id*.)

On September 14, 2019, Ms. Nimocks presented to the emergency room at Mercy Hospital, complaining of a headache and neck and back pain.  (Tr. 366-67.)  She was prescribed Tylenol and Percocet.  (Tr. 367.)  She reported that she was taking Tylenol but it was not helping.  (Tr. 366.)  She demonstrated paralumbar tenderness on examination, but motor strength was normal bilaterally, and there was no edema.  (Tr. 368.)  She was diagnosed with neck pain and advised to follow up with her doctors regarding removal of the spinal stimulator and further options for her neck pain.  (Tr. 369.)

Ms. Nimocks presented to Dr. Akers on September 17, 2019 for follow up regarding her neck pain.  (Tr. 365.)  She said the pain was bilateral in the posterior and travelled up towards the base of her skull.  (*Id*.)  On examination, Dr. Akers noted "some point tenderness in the musculature and the back portion in the base of the occipital areas."  (*Id*.)  Ms. Nimocks's neck range of motion was "fairly normal," there was no atrophy, and there was normal trapezius function.  (*Id*.)  Dr. Akers prescribed a 12-day Prednisone taper and Baclofen.  (*Id*.)  He discontinued Percocet because it was not working.  (*Id*.)

Although spinal stimulator removal surgery was not scheduled, Ms. Nimocks returned to Dr. Akers on October 23, 2019, for another a pre-operative examination.  (Tr. 362-63.)  Examination findings were unremarkable.  (Tr. 363.)

5

On October 24, 2019, Ms. Nimocks met with Azedine Medhkour, M.D., in the surgery clinic at the University of Toledo to discuss removal of her spinal cord stimulator, reporting a burning pain and pressure in her neck and back of her head with discomfort where the battery was located.  (Tr. 285-86.)  She rated her pain at 9/10 and said she would rather have back pain without the spinal cord stimulator than have the symptoms associated with the spinal cord stimulator.  (*Id.*)  She also reported: back pain; left lower extremity swelling, weakness, and numbness; severe headaches; sleep disturbances; and fatigue.  (Tr. 286.)  She ambulated normally and was in no acute distress during her examination.  (Tr. 287.)  Her motor strength and tone were normal and there was no cyanosis or edema.  (*Id.*)  Her gait and station were normal. (*Id.*)  Dr. Medhkour removed Ms. Nimocks's spinal cord stimulator the following week on October 30, 2019.  (Tr. 308-09.)

On November 23, 2019, Ms. Nimocks presented to the emergency room at Mercy Hospital, complaining of a headache and neck pain.  (Tr. 358.)  She denied numbness or tingling. (*Id.*)  She demonstrated tenderness to palpation in the paraspinal muscles of the cervical spine on examination of the neck and limited range of motion secondary to pain, but no midline tenderness, step-off deformity, or swelling.  (Tr. 359.)  She had a normal range of motion on musculoskeletal examination.  (*Id.*)  She was diagnosed with neck pain and prescribed Percocet and Flexeril.  (Tr. 360-61.)  She was instructed to follow up with her family doctor regarding a referral to pain management.  (Tr. 360.)

Ms. Nimocks was admitted to Blanchard Valley Hospital ("Blanchard") on May 25, 2020 with concern for acute spinal cord injury in light of symptoms of left leg paralysis, diminished reflexes, and loss of bowel and bladder control.  (Tr. 671.)  She had no movement in her left leg on examination.  (Tr. 665.)  A CT scan of the thoracic spine showed a small left paracentral

6

posterior disc protrusion at T10-T11 with no central spinal or neural foraminal stenosis.  (Tr. 660, 671.)  There was moderate to severe degenerative osteoarthritis at the T8-T9 area.  (Tr. 660, 672.)  It was determined that Ms. Nimocks needed an MRI and needed to be at a medical facility where neurosurgery was available.  (*Id*.)  Since the MRI machine was not working at Blanchard, Ms. Nimocks was transferred to OSU Wexner Medical Center ("OSU").  (Tr. 629, 665, 671.)  At a May 26, 2020 examination, Ms. Nimocks's cervical range of motion was normal but she demonstrated tenderness to palpation in the thoracic and lumbar spine.  (Tr. 631.)  Strength in her left lower extremity was 0/5 on neurological testing, and she had decreased gross sensation in the left lower extremity and perianal.  (Tr. 631-32.)  She demonstrated 5/5 strength in the right lower extremity and intact gross strength in the upper extremities.  (Tr. 632.)  She was unable to ambulate due to weakness; an MRI was ordered to evaluate for spinal pathology.  (Tr. 635.)

Ms. Nimocks underwent an orthopedic spine surgery consult during her admission at OSU, which was conducted by Safdar Khan, M.D., on May 26, 2020.  (Tr. 637.)  She reported that she was at home the day before and went to stand but was unable to do so.  (*Id*.)  She reported three days of bladder and bowel issues, but she also reported normal bladder and bowel function over the same period.  (*Id*.)  During the orthopedic consultation, her cervical range of motion was painless but her lumbar range of motion could not be assessed because she was in bed.  (Tr. 638.)  She demonstrated tenderness to palpation over the thoracic spine, but no tenderness to palpation over the lumbar midline.  (*Id*.)  She demonstrated normal strength in the upper extremities, right lower extremity, left hamstring, and left gastrocsoleus sacroiliac, but 2+/5 strength in the left hip and quadricep and 0/5 strength in the left anterior tibialis L4, EHL L5, and peroneals.  (Tr. 639.)  Sensation in the right lower extremity was grossly intact, but she had no sensation to light touch or pinprick diffusely in the left lower extremity.  (*Id*.)  The

7

orthopedic team concluded: "Unclear etiology at this point but given dense loss of sensation and motor function in entire extremity, unlikely to be related to the spine across so many nerve roots." (Tr. 640.)  They recommended a "neurology consultation to assess for any upper neurological etiology." (*Id*.)  There were no recommended activity restrictions. (*Id*.)  The impression from Ms. Nimocks's lumbar spine MRI was: remote postoperative changed in the lumbar spine with stable alignment as compared to 2015 imaging and good compression of the lumbar spinal canal; chronic cystic dural ectasia in the lower lumbar spine and chronic displacement/clumping of the cauda equina nerve roots suggesting arachnoiditis;[2] chronic mild lumbar spinal stenosis above the fusion at L1-2, stable since 2015. (Tr. 655-56; *see also* Tr. 648.)  Her thoracic spine MRI was unremarkable. (Tr. 656; *see also* Tr. 648.)

During a physical therapy evaluation during her admission on May 26, 2020 (Tr. 641-46), Ms. Nimocks reported that she had a straight cane and wheeled walker at home (Tr. 642).  She reported that she "furniture walked" at home or used her wheeled walker or cane as necessary depending on the day. (*Id*.)  Physical therapy concluded that Ms. Nimocks should be safe to return home from a mobility aspect, with assistance from family as needed. (Tr. 641.)  Orthopedic progress notes reflect that Ms. Nimocks reported her radiating left leg pain had improved since her admission. (Tr. 646-47.)  She reported that she always had slight weakness and numbness and some tingling in her left leg, but she normally ambulated without assistance and could perform her activities of daily living. (Tr. 647.)  She was discharged home on May 26, 2020 (Tr. 629) having been assessed with an "episode of sciatica" (Tr. 648).

---

[2] It was noted that the dural ectasia and associated bone scalloping / remodeling was long-standing and had progressed mildly since 2015. (Tr. 656.)

On June 12, 2020, Ms. Nimocks presented to Melissa Fox, APRN-CNP at Neurosurgical Associates of NW Ohio with complaints of back pain. (Tr. 436.) She reported pain in the lower thoracic region and lumbar region. (*Id*.) She also reported chronic paresthesias and swelling in her left leg and chronic paresthesias of the right foot. (Tr. 436, 437.) She demonstrated tenderness in the lower thoracic and lumbar spine on examination, primarily on the left side. (Tr. 437.) Reflexes at the Achilles and bilateral patellar were noted to 1-2+ in the lower extremity, but Achilles reflexes were absent on the left. (*Id*.) Clonus was also absent. (*Id*.) There was full strength in the upper and lower extremities bilaterally and Ms. Nimocks could stand on her heels and toes with balance support, but she had difficulty walking on her toes on the left. (*Id*.) Ms. Nimocks was diagnosed with chronic mid and low back pain, left lower extremity paresthesia, and right foot paresthesia. (*Id*.) CNP Fox recommended conservative management of pain with pain management follow up. (Tr. 438.)

Ms. Nimocks presented to Nadeem Moghal, M.D. at Promedica Health System on August 28, 2020, regarding her chronic back, neck, and leg pain. (Tr. 458-62.) She displayed positive Spurling signs on examination with decreased cervical range of motion in all directions due to pain. (Tr. 461.) Dr. Moghal noted severe cervical facet tenderness bilaterally, thoracic facet loading pain bilaterally, and severe thoracic facet column tenderness. (*Id*.) There were no specific lower extremity examination findings recorded. (*Id*.) Ms. Nimocks was diagnosed with post-laminectomy syndrome in the lumbar region, sacroiliitis not elsewhere classified, lumbar spondylosis, and chronic bilateral low back pain without sciatica. (*Id*.) Dr. Moghal prescribed Tramadol. (*Id*.) He recommended cervical and thoracic x-rays and diagnostic cervical facet injections at C2-3, C3-4. (*Id*.) The thoracic and cervical x-ray were normal. (Tr. 480-82.)

9

Ms. Nimocks returned to Dr. Moghal on September 21, 2020.  (Tr. 452-56.)  Examination findings were similar to those from her August 28, 2020 examination.  (*Compare* Tr. 455 *with* Tr. 461.)  Dr. Moghal administered a cervical facet nerve block bilaterally at C2-C3 and C3-C4. (Tr. 456.)  On September 23, 2020, Ms. Nimocks returned to Promedica.  (Tr. 446.)  She saw Patricia Kroncke, APRN-CNS.  (*Id*.)  She told CNS Knoncke that she only had two hours of relief from the nerve blocks on September 21.  (Tr. 447.)  She reported that Tramadol did not help and it made her nauseated.  (Tr. 449.)  She was tearful.  (Tr. 447.)  She said she did not want "pain pills" and she thought that the spinal cord stimulator was a "joke."  (*Id*.)  She reported doing home exercises that she learned after prior back surgeries.  (*Id*.)  Physical therapy was recommended.  (Tr. 449.)  Ms. Nimocks attended twelve physical therapy sessions from September 30 through November 11, 2020.  (Tr. 737.)  She was discharged on November 11, 2020 after reaching a plateau in her progress.  (Tr. 747.)  At discharge her pain level remained unchanged from her pre-treatment, which she rated 9/10.  (*Id*.)

On March 5, 2021, Roy Harris, M.D., recommended Ms. Nimocks for medical marijuana for chronic intractable pain.  (Tr. 659.)

## 2.    Opinion Evidence

State agency medical consultant W. Scott Bolz, M.D. completed a physical RFC assessment on July 21, 2020 (Tr. 70-71, 76-77), opining that Ms. Nimocks had the RFC to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (Tr. 70, 76).  Dr. Bolz opined that Ms. Nimocks's ability to push and/or pull objects, including operation of foot controls, in her lower extremities was limited to frequent.  (*Id*.)  Dr. Bolz opined that Ms. Nimocks had the following postural limitations: occasional climbing of ladders,

10

ropes, and scaffolds; occasional stooping and crouching; frequent kneeling, crawling, and climbing of ramps and stairs; and unlimited balancing.  (Tr. 70-71, 76-77.)  Dr. Bolz found no manipulative, visual, communicative, or environmental limitations.  (Tr. 71, 77.)

On reconsideration on October 9, 2020, state agency medical consultant Gerald Klyop affirmed Dr. Bolz' RFC assessment.  (Tr. 83-85, 89-91.)

## C. Hearing Testimony

### 1. Plaintiff's Testimony

At her April 8, 2021 hearing, Ms. Nimocks testified in response to questioning by the ALJ and her representative.  (Tr. 38-48.)  She reported that she could drive, but could only sit in a vehicle for about twenty minutes.  (Tr. 39.)  She said her back pain, headaches, and left leg numbness prevented her from working full-time, explaining that her left leg went completely numb at times.  (Tr. 40-41.)  She also reported constant swelling in her left leg, saying she elevated the leg but said that did not help with the swelling.  (Tr. 46.)  She said her headaches also made it difficult for her to function, and that bending down to pick something up caused the back of her head to hurt so badly that she could not move or function.  (Tr. 46.)  She rated her head pain at 10/10, two or three times daily, with associated dizziness at times.  (Tr. 47.)

Ms. Nimocks reported she could walk two city blocks as of six months before the hearing, but could only walk about one city block by the time of the hearing.  (Tr. 41.)  She could stand for only twenty minutes, which she said had been the case for about five years.  (*Id.*)  She could sit for twenty to thirty minutes at a time, had been unable to bend at her waist since her last surgery in 2008, and could squat with her knees but could not get back up.  (Tr. 42.)   She required a cane or assistance from another person to rise from a seated position.  (Tr. 45-46.)  She could sleep for six to eight hours at night with prescribed sleeping pills.  (Tr. 43.)

11

Otherwise, she said she could sleep two hours at a time and four hours in a night.  (Tr. 42.)  She was given temporary lifting restrictions by her doctors following past surgeries, but reported no permanent lifting restrictions.  (*Id*.)

Ms. Nimocks said she participated in physical therapy, which did not help at all.  (Tr. 44.)  She had tried injections, but said they only helped relieve her pain for a day.  (Tr. 44-45.)  She reported using a cane, which the physical therapist at OSU had recommended for balance.  (Tr. 45.)  She could walk up and down stairs if someone was behind her to assist her.  (*Id*.)  She was not taking pain medication but was using medical marijuana, which helped a little.  (Tr. 47-48.)

Ms. Nimocks reported that her mom had to help her wash her legs because she was unable to bend down.  (Tr. 43.)  It had been difficult for her to perform chores for four years because doing so required her to bend.  (*Id*.)  She was able to cook a meal if it did not take long. (*Id*.)  She enjoyed reading.  (Tr. 44.)  She used to enjoy walking outside, but said she had not walked for pleasure for about four years because it hurt too much to do so.  (*Id*.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 48-53.)  After classifying Ms. Nimocks's past work as a store clerk (SVP 2, light/medium), sales clerk (SVP 3, light), and inspector / hand packager (SVP 2, light) (Tr. 48-49), the ALJ asked the VE a series of hypothetical questions (Tr. 49-53.)  First, the ALJ asked the VE to consider a hypothetical individual of Ms. Nimocks's age, education, and work experience with the residual functional capacity to perform work at the light exertional level with the following limitations: occasional climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; occasional stooping, kneeling, crouching, and crawling; frequent use of bilateral lower extremities for pushing, pulling, and operation of foot controls; frequent use of bilateral upper extremities for

reaching and handling; and avoidance of concentrated exposure to hazards such as dangerous moving machinery and unprotected heights.  (Tr. 49-50.)  The VE testified that the described individual would be able to perform at least two of Ms. Nimocks's past jobs.  (Tr. 50.)  The VE also testified that there would be other jobs in the national economy that the individual could perform, including price marker, furniture rental clerk, and garment sorter.  (Tr. 50-51.)

For his second hypothetical, the ALJ asked the VE to assume the first hypothetical with the additional limitation of a sit/stand option to allow the individual to alternate positions for one or two minutes in the immediate vicinity of the workstation no more frequently than every thirty minutes.  (Tr. 51.)  With the additional limitation, the VE testified that the individual could perform Ms. Nimocks's past work as an inspector / hand packager and store clerk, as well as the previously identified jobs of garment sorter, furniture rental clerk, and price marker.  (*Id*.) However, the VE testified that there would be a significant reduction in the number of price marker jobs available in the national economy, indicating that there would be about 20,000 available (a reduction down from 160,000).  (*Id*.)

For his third hypothetical, the ALJ asked the VE to assume an individual who could perform work at the sedentary level with all the other limitations set forth in the second hypothetical and the individual would need to use a cane for ambulation.  (Tr. 51.)  The VE testified that the described individual would be unable to perform Ms. Nimocks's past work, but there would be jobs in the national economy that the individual could perform, including final bench assembler, charge account clerk, and food and beverage clerk.  (Tr. 51-52.)

For his final hypothetical, the ALJ asked the VE whether there would be work available to an individual at any exertional level if consistently off task more than 10% of the workday. (Tr. 52.)  The VE testified that there would be no work available in the national economy, adding

13

that the tolerance for workers being off task is no more than 10%, or six minutes per hour. (*Id*.) The VE also testified that the tolerance for absences on a monthly basis was one day. (Tr. 52-53.) Thus, missing two days per month on average would be work preclusive. (Tr. 53.)

Ms. Nimocks's attorney asked the VE whether there would be jobs available to the individual described in the ALJ's third hypothetical if the individual would need to elevate her legs throughout the course of the workday. (Tr. 53.) The VE testified that the additional limitation would be work preclusive. (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

14

3.      If the claimant is not doing substantial gainful activity, is suffering from a
        severe impairment that has lasted or is expected to last for a continuous
        period of at least twelve months, and his impairment meets or equals a listed
        impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must
        assess the claimant's residual functional capacity and use it to determine if
        the claimant's impairment prevents him from doing past relevant work.  If
        the claimant's impairment does not prevent him from doing his past relevant
        work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if,
        based on his vocational factors and residual functional capacity, he is
        capable of performing other work that exists in significant numbers in the
        national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.      The ALJ's Decision

Below is a summary of the findings made by the ALJ in his April 16, 2021 decision:

1.      The claimant meets the insured status requirements of the Social Security
        Act through December 31, 2024.  (Tr. 18.)

2.      The claimant has not engaged in substantial gainful activity since May 30,
        2019, the alleged onset date. (*Id.*)

3.      The claimant has the following severe impairments:  disorders of back
        discogenic and degenerative/sciatica, with pain, status post surgeries and

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

spinal cord stimulator implant. (Tr. 18-19.) The claimant has the following non-severe impairments: migraine/headaches and chronic paresthesia left leg and right foot. (Tr. 19.) The evidence did not establish impairments of dizziness or left leg edema. (*Id*.)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments. (Tr. 19-20.)

5.  The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except: Postural limitation of occasional climbing of ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Occasional stooping, kneeling, crouching, and crawling. Frequent use of the bilateral lower extremities for pushing, pulling, and operation of foot controls. Manipulative limitation of frequent use of the bilateral upper extremities for reaching and handling. Environmental limitation to avoid concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights. (Tr. 21-27.)

6.  The claimant is capable of performing past relevant work as a sales clerk and inspector/packager. (Tr. 27-28.) Alternately, considering the claimant's age, education, work experience,[4] and residual functional capacity there are jobs that exist in significant numbers in the national economy that she can perform, including price marker, rental clerk, and garment sorter. (Tr. 28-29.)

Based on the foregoing, the ALJ determined that Ms. Nimocks had not been under a disability, as defined in the Social Security Act from May 30, 2019, through the date of the decision. (Tr. 29.)

## V.    Plaintiff's Arguments

Ms. Nimocks argues the Commissioner's decision lacks the support of substantial evidence because the ALJ failed to adequately evaluate her subjective complaints and failed to fully account for her limitations in the RFC. (ECF Doc. 9, pp. 10-16; ECF Doc. 12.)

---

[4] The claimant was born in 1973 and was 46 years old, which is defined as a younger individual age 18-29, on the alleged onset date, and has at least a high school education. (Tr. 28.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    Sole Assignment of Error: Whether ALJ Adequately Evaluated Ms. Nimocks's Subjective Complaints and Symptoms and Fully Accounted for Limitations in RFC**

Ms. Nimocks argues the Commissioner's decision lacks the support of substantial evidence because the ALJ failed to adequately evaluate her subjective complaints and symptoms, and then failed to fully account for her limitations in the RFC.  (ECF Doc. 9, pp. 10-16; ECF Doc. 12.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit

18

the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 22), so the discussion will be focused on the ALJ's compliance with the second step.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c). *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. § 404.1529(c)(3).

Ms. Nimocks argues that the ALJ lacked substantial evidence and failed to build a logical bridge between the evidence and his findings regarding her subjective statements because he used boilerplate language, focusing on her "complaints of significant left leg pain and numbness."  (ECF Doc. 9, pp. 13-14.)  She asserts that her left leg complaints were "documented in [her] testimony, but also appear several times throughout the medical evidence" in 2019.  (*Id.* at p. 13.)  She also notes that there were "significant examination findings" in May 2020 and complaints of chronic paresthesia and swelling in her left leg in June 2020, which the ALJ discussed, and argues that "[i]t is unclear how [Ms. Nimocks]'s consistent complaints of left leg numbness and loss of feeling, combined with examination results showing significant deficits in strength and sensation, correlate to the ability to frequently use of the bilateral lower extremities for pushing, pulling, and operation of foot controls."  (*Id*. at pp. 13-14.)

As a general matter, a decision will not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer*,

19

774 F. Supp. 2d at 877.  Additionally, an ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *See* SSR 16-3p, 82 Fed. Reg. 49467.

Consistent with these general principles, use of boilerplate language by an ALJ when evaluating the consistency of a claimant's subjective statements with the evidence of record is acceptable so long as the ALJ supplies sufficient explanation for discounting the subjective statements.  *See Sorrell v. Comm'r of Soc. Sec.*, 656 F. App'x 162, 174 (6th Cir. 2016) (finding use of template language "is not by itself erroneous" where the "ALJ provide[s] an adequate explanation of the adverse credibility finding, pointing to, among other things, [claimant's] inconsistent statements, and her failure to provide medical evidence supporting her claims regarding the intensity and pervasiveness of her pain"); *Barnes v. Comm'r of Soc. Sec.*, No. 16-13714, 2018 WL 1474693, at *12 (E.D. Mich. Mar. 6, 2018) (finding claimant's challenge to the use of "boilerplate language" without merit where adequate explanation of the ALJ's credibility analysis was "found throughout her decision, where she discussed the lack of positive clinical findings, the largely normal test results, the lack of abdominal pain found at most encounters, the drug-seeking behavior, the lack of follow up with a specialist, and the few encounters with any treating physician") (citing *Sorrell*, 656 Fed App'x at 174), *report and recommendation adopted,* No. 16-13714, 2018 WL 1471440 (E.D. Mich. Mar. 26, 2018).

Thus, the question for resolution by this Court is whether the ALJ provided sufficient explanation for his finding that Ms. Nimocks's subjective statements regarding her left lower extremity limitations were not entirely consistent with the evidence of record.  Considering the ALJ's decision as whole, the Court finds the ALJ sufficiently explained his basis for finding Ms.

20

Nimocks's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 22.)  The Court additionally finds that determination was supported by substantial evidence, for the reasons explained below.

To start, the ALJ considered Ms. Nimocks's left lower extremity impairment at Step Two but concluded that her alleged chronic paresthesia of the left leg was not a severe impairment.  (Tr. 19.)  The ALJ explained that it was not a severe impairment because her "physicians [had] not opined any limitations caused by [the] condition[]" and there was "no evidence that [the] condition[] had more than a minimal limitation on . . . [her] ability to perform work-related activities."  (*Id*.)  The ALJ further concluded that the record was "devoid of evidence to establish . . . the impairment of . . . left leg edema."  (*Id*.)  Ms. Nimocks does not challenge these Step Two findings or point to any medical evidence showing limitations caused by these impairments beyond those limitations included in the RFC assessed by the ALJ.

Further, the only medical opinions in evidence are the opinions of the state agency medical consultants, who opined that Ms. Nimocks "could perform light work except she is limited to frequent use of the lower extremities for pushing/pulling objects to include operation of foot controls. She can frequently climb ramps/stairs, can occasionally climb ladders/ropes/scaffolds, frequently kneel and crawl, and occasionally stoop and crouch."  (Tr. 26, 70-71, 76-77, 83-85, 89-91.)  The ALJ considered these opinions and found them persuasive, explaining: "the suggested limitations are consistent with the objective findings and conservative treatment modalities followed by the claimant based upon the evidence received at the hearing level inclusive of diagnostic imaging reports and exam findings which do not warrant greater than light limitations."  (Tr. 26.)  The ALJ also added additional limitations to the RFC,

21

including manipulative limitations to account for objective cervical related findings and environmental limitations due to Ms. Nimocks's combined impairments.  (*Id.*)  Notably, Ms. Nimocks also does not challenge the ALJ's reliance upon the medical consultants' opinions in support of his assessment of her subjective symptoms and the RFC.

In addition to his Step Two findings and evaluation of the persuasiveness of the medical opinions, the ALJ also provided a detailed discussion of Ms. Nimocks's treatment history (Tr. 22-26), including the examination findings from the May 2020 hospitalization that Ms. Nimocks says recorded the "most significant examination findings" (Tr. 24-25; ECF Doc. 9, p. 13), and Ms. Nimocks's subsequent treatment visits (Tr. 25-26).  This discussion provides additional explanation supporting this Court's determination that the ALJ's findings regarding Ms. Nimocks's subjective statements are supported by substantial evidence.

In particular, the ALJ acknowledged that Ms. Nimocks received treatment in May 2019 for complaints of low back pain into the legs, left greater than on right, with examination findings noting an antalgic gait with a left leg limp.  (Tr. 22-23, 275.)  A month later, in June 2019, he noted that she presented for emergency room treatment for increasing back pain, but denied radiation or increased numbness and tingling in her bilateral lower extremities and reported she was working in factory where she was on her feet working long shifts.  (Tr. 23, 372.)  In June 2019, she saw CNP Zimmerman for back pain, where she reported associated symptoms of left leg pain, numbness, tingling, and weakness, but her examination noted a normal musculoskeletal range of motion and no edema.  (Tr. 23, 369-70.)  Ms. Nimocks also followed up with Dr. Eppig in June 2019, demonstrating an antalgic gait and left leg limp with apparent weakness and antalgic left toe walking, but her straight leg raise was negative and her

strength was normal.  (Tr. 23, 273.)  Dr. Eppig noted that her lumbar fusion was solid and he could not correlate her pain complaint to the lumbar spine or adjacent level.  (Tr. 23, 274.)

In September, October and November 2019, the ALJ noted that Ms. Nimocks's examination findings were generally normal, including: normal motor strength bilaterally and no edema (Tr. 23, 368); normal ambulation, normal motor strength and tone, and normal gait and station (Tr. 24, 287); and normal range of motion except for reduced range of motion in the cervical spine (Tr. 24, 359).

The ALJ then observed that Ms. Nimocks did not seek treatment again until May 2020, when she sought emergency treatment for back pain and left lower extremity weakness and numbness.  (Tr. 24.)  During that hospitalization, examination findings revealed 0/5 strength in the left lower extremity and decreased gross sensation in the left lower extremity and perianal, but 5/5 strength in the right lower extremity and intact gross strength in the upper extremities.  (Tr. 24, 631-32.)  Ms. Nimocks was unable to ambulate due to weakness and an MRI was ordered to evaluate for spinal pathology.  (Tr. 635.)  At an orthopedic spine consultation during that hospitalization, she demonstrated normal strength in the upper extremities, right lower extremity, left hamstring, and left gastrocsoleus sacroiliac, but 2+/5 strength in the left hip and quadricep and 0/5 strength in the left anterior tibialis.  (Tr. 25, 639.)  Sensation in her right lower extremity was grossly intact, but there was no sensation to light touch or pinprick diffusely in the left lower extremity.  (*Id*.)  The orthopedic team concluded that Ms. Nimocks's symptoms were not likely related to her spine (Tr. 25, 640), stating: "Unclear etiology at this point but given dense loss of sensation and motor function in entire extremity, unlikely to be related to the spine across so many nerve roots" (Tr. 640).  She was discharged home in stable condition.  (Tr. 25, 629, 648.)

Ms. Nimocks consulted with neurosurgery a month later, in June 2020, complaining of back pain and chronic paresthesia and swelling in the left lower extremity.  (Tr. 25, 436, 437.)  But her examination findings showed improvement, with full strength in the upper and lower extremities bilaterally and an ability to stand on her heels and toes with balance support; she did have difficulty walking on her toes on the left.  (Tr. 25, 437.)  Reflexes at the Achilles and bilateral patellar were noted to 1-2+ in the lower extremity, but Achilles reflexes were absent on the left and clonus was absent.  (*Id*.)  Conservative management of her back pain was recommended and she was advised to follow up with pain management.  (Tr. 25, 437, 438.)

Ms. Nimocks received further treatment for her back-, neck-, and leg-pain-related complaints in August and September 2020, but no specific lower extremity examination findings were recorded.  (Tr. 25-26, 452-56, 458-62.)  Tramadol was prescribed.  (Tr. 26, 461.)  Cervical and thoracic x-rays were normal.  (Tr. 26, 480-82.)  She received bilateral cervical nerve blocks in September 2020 (Tr. 26, 456) and attended physical therapy from September 2020 through November 2020 for her neck pain, headaches, and low back pain (Tr. 26, 747).  In March 2021, medical marijuana was recommended.  (Tr. 26, 493.)

As the ALJ's discussion of the evidence makes clear, the left lower extremity examination findings during Ms. Nimocks's May 2020 hospitalization were more significant than prior examination findings during the alleged disability period, and were also of limited duration.  The ALJ accurately catalogued examination findings showing notable improvement only a month after her OSU admission, when her neurologist recommended only conservative treatment.  There were no specific treatment recommendations associated with Ms. Nimocks's left lower extremity complaints.  And even though Ms. Nimocks continued treatment for back, neck, and leg pain later in 2020, the course of treatment outlined by the ALJ remained

24

conservative, with treatment recommendations including physical therapy and a cervical facet injection.  The Court finds that the Ms. Nimocks's reliance on the examination findings from May 2020 to show that the ALJ's evaluation of her subjective symptoms lacked substantial evidentiary support or a logical bridge falls short of demonstrating harmful error.  The ALJ's discussion of the examination findings and conservative treatment modalities clearly illustrated that Ms. Nimocks's clinical findings relating to her left lower extremity were not consistently as severe as they were in May 2020.

Additionally, as discussed earlier, the ALJ considered and relied upon the opinions of the state agency medical consultants, which included the lower extremity limitations adopted by the ALJ.  Ms. Nimocks does not assert an assignment of error challenging the ALJ's consideration of this opinion evidence and has not cited to medical opinion evidence supporting a need for additional lower extremity functional limitations.  Further, although it appears that the state agency medical consultants did not consider the May 2020 treatment records in rendering their opinions, the Court concludes that clinical findings from an acute episode of sciatica that significantly resolved shortly thereafter are insufficient to deprive the ALJ of substantial evidence to support his adoption of the state agency consultants' recommended lower extremity limitations.  Finally, the ALJ's findings at Step Two that Ms. Nimocks's left leg impairments were either nonsevere or not medically determinable have gone unchallenged.

The Court finds that the ALJ's discussion and analysis of the evidence is not summary or boilerplate.  Regardless of whether boilerplate language was used in the decision, the ALJ provided adequate explanation to illustrate his reasons for finding Ms. Nimocks's subjective statements were not entirely consistent with other evidence in the record.  Certainly, Ms. Nimocks points to no evidence the ALJ failed to consider.  As the ALJ explained, he did not

25

conclude that Ms. Nimocks "was symptom free or did not experience difficulty performing some tasks determination." (Tr. 27.) Instead, he found "the objective evidence [did] not demonstrate the existence of limitations of such severity as to have precluded . . . [her] from performing all work on a regular and continuing basis at any time from the alleged onset date of disability." (*Id.*) The ALJ accounted for limitations in the RFC to account for her pain related symptoms, including those related to her left leg impairment. (Tr. 21.)

It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. The Court's role is to determine whether the ALJ's decision is supported by substantial evidence. Indeed, even if substantial evidence supports Ms. Nimocks's position, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Although a decision will not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result" *Fleischer*, 774 F. Supp. 2d at 877, the Court finds that the ALJ's decision provided sufficient explanation to allow this Court to meaningfully review the decision.

For the reasons set forth above, the Court holds that the ALJ's finding that Ms. Nimocks's statements were not entirely consistent with other evidence of record was supported by substantial evidence, as was the ALJ's assessment of Ms. Nimocks's RFC. Accordingly, the Court finds Ms. Nimocks's sole assignment of error is without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.


February 23, 2024                                   */s/ Amanda M. Knapp*
                                                    AMANDA M. KNAPP
                                                    UNITED STATES MAGISTRATE JUDGE